UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

YVONNE JENKINS-DEWINDT,

              Plaintiff,

v.                                              Case No.  5:07-cv-314-Oc-10GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

              Defendant.

_____/

## ORDER

        Plaintiff appeals from a final decision of the Commissioner of Social Security

("the Commissioner") denying her application for disability insurance benefits. (Doc. 1.)

The Commissioner has answered (Doc. 4), and both parties have filed briefs outlining

their respective positions. (Docs. 12 & 15.) For the reasons discussed below, the

Commissioner's decision is due to be **REVERSED**.

## I.  PROCEDURAL HISTORY

        On April 18, 2002, Plaintiff filed an application for disability insurance benefits,

alleging a disability onset date of March 27, 2001.[1] Plaintiff's application was denied

initially and upon reconsideration. (R. at 37, 44-47.) Thereafter, Plaintiff timely pursued

her administrative remedies available before the Commissioner and requested a

hearing before an Administrative Law Judge ("ALJ"). (R. at 34-35, 48.) The ALJ

---

        [1] (R. at 17, 106.) Plaintiff previously filed applications for disability, disability insurance benefits,
and supplemental security income payments on June 5, 2001, alleging a disability onset date of March 27,
2001. (R. at 36.) After the claim was denied initially (R. at 38-43), the Plaintiff did not seek reconsideration
of the decision. (R. at 17.) Accordingly, the ALJ applied res judicata and dismissed Plaintiff's request for a
hearing concerning the denial of her April 2002 claim as to the time period commencing March 27, 2001
and ending October 18, 2001. Id.

conducted Plaintiff's administrative hearing on September 22, 2005. (R. at 546-94.) The

ALJ issued a decision unfavorable to Plaintiff on November 14, 2005. (R. at 14-33.)

Plaintiff's request for review of the hearing decision by the Appeals Council was denied

on June 8, 2007.  (R. at 5-8, 13.) Plaintiff then appealed to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[2] Substantial evidence is more than a scintilla in that the evidence must do

more than merely "create a suspicion of the existence of [a] fact," and must include

"such relevant evidence as a reasonable person would accept as adequate to support

the conclusion."[3]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against the

Commissioner's decision.[4] The district court must view the evidence as a whole, taking

into account evidence favorable as well as unfavorable to the decision.[5] However, the

district court will reverse the Commissioner's decision on plenary review if the decision

applies incorrect law, or if the decision fails to provide the district court with sufficient

---

[2] *See* 42 U.S.C. § 405(g).

[3] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[4] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[5] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

reasoning to determine that the Commissioner properly applied the law.[6]   The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[7] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[8]

The ALJ must follow five steps in evaluating a claim of disability.[9] First, if a claimant is working at a substantial gainful activity, she is not disabled.[10] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.[11] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[12] Fourth, if a claimant's impairments do

---

[6] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[7] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[8] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-.1511.

[9] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. See Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[10] 20 C.F.R. § 404.1520(b).

[11] Id. § 404.1520(c).

[12] Id. § 404.1520(d).

not prevent her from doing past relevant work, she is not disabled.[13] Fifth, if a claimant's impairments (considering her residual functional capacity ("RFC"),[14] age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled.[15]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[16] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[17] The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[18]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of

---

[13] 20 C.F.R. § 404.1520(e).

[14] An individual's RFC is "the most [Plaintiff] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1).

[15] Id. § 404.1520(f).

[16] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); *see also* Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[17] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[18] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

exertion.[19] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[20]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[21] Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[22] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.[23]

### III. SUMMARY OF THE EVIDENCE

Plaintiff was forty seven (47) years old at the time of the ALJ's decision on November 14, 2005. (R. at 550.) She has some high school education[24] and has previous work experience as a bus operator and an ambulance driver. (R. at 138, 550-

---

[19] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[20] Walker, 826 F.2d at 1003.

[21] Wolfe, 86 F.3d at 1077-78.

[22] See id.

[23] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

[24] (R. at 143, 550.) The record is not clear as to when Plaintiff discontinued her high school education. Id. However, Plaintiff testified that she did not graduate, did not get a GED, nor did she receive any other training. (R. at 550.)

51.) Plaintiff contends that she has been unable to work since March 27, 2001, due to vertigo, carpal tunnel syndrome,[25] and depression. (R. at 106,137.)

In his review of the record, including Plaintiff's testimony, medical records from several health care providers, and testimony from a medical expert, the ALJ determined that Plaintiff's bilateral carpal tunnel syndrome and vertigo are "severe" impairments. (R. at 28.) The ALJ determined that Plaintiff does not have an impairment or combination of impairments which meet or medically equal one of the impairments listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations.[26]     The ALJ then found that Plaintiff retains the RFC to perform the exertional demands of sedentary work[27] subject to certain limitations.  Specifically, the ALJ found Plaintiff can perform fine manipulations[28] occasionally and she is to avoid hazardous machinery, heights, and operating vehicles. (R. at 30.) After finding that Plaintiff could not perform her past relevant work as a bus driver, the ALJ proceeded to step five. (R. at 31.)

---

[25] Carpal tunnel syndrome is defined as "numbness, tingling, weakness, and pain in the thumb, index, and middle fingers resulting from pressure on the median nerve where it passes into the hand via a gap (the carpal tunnel) under a ligament at the front of the wrist." AMA ENCYCLOPEDIA OF MEDICINE 238-39 (2000).

[26] (R. at 28.) The ALJ noted that he gave particular attention to the listings in sections 1.00 and 11.00. Id.

[27] The ALJ concluded that Plaintiff was capable of "work which requires lifting and carrying objects weighing 10 pounds frequently; sitting for 6 hours in an 8 hour work day; [and] standing/walking 2 hours in an 8 hour work day." (R. at 30.)

[28] "Fine manipulation" refers to a person's ability to use their hands and fingers to make small coordinated movements such as grasping an object between the thumb and a finger. See, e.g., Soc. Sec. Admin. Rul. 83-14, 1983 WL 31254.

6

The ALJ used the Medical-Vocational Guidelines (the "grids")[29] as a "framework" and relying upon the Girds concluded that Plaintiff would be found not disabled. However, because the ALJ noted that the Plaintiff's ability to perform all or substantially all of the requirements of sedentary work is impeded by additional exertional and/or non-exertional limitations the ALJ consulted with a vocational expert ("VE") to determine whether Plaintiff retains the capacity for work that exists in significant numbers in the national economy.  (R. at 32, 583-92.)

During the hearing, the ALJ posed several hypotheticals to the VE. (R. at 583-86.)  The VE provided his expert opinion and concluded that the job of surveillance monitor would be the only position available for an individual with the limitations included in the hypothetical.[30] The ALJ ultimately concluded that Plaintiff is not under a "disability" as defined in the Social Security Act because she has the capacity to work as a sorter, packer, and surveillance monitor. (R. at 32.)

Plaintiff raises two issues in her appeal—neither of which address the ALJ's assessment of Plaintiff's vertigo.  First, the Plaintiff asserts that the ALJ erred in failing to find Plaintiff's depression severe at step two and in failing to consider the impact of Plaintiff's depression on Plaintiff's RFC at step four. Plaintiff also argues that the ALJ

---

[29] 20 C.F.R. § 404, subpt. P, app. 2.

[30] The VE testified that a "surveillance monitor" would be the only position available for an individual like the one described in the following hypothetical posed by the ALJ:
> "[a]ssume an individual of the claimant's age, education and work history.  Assume that individual is restricted to sedentary work. Assume that individual should avoid heights, machinery, . . . operation of motor vehicles, and assume that individual is restricted to any fine-finger manipulation. In other words, can perform gross manipulation but not a job that would involve continual repetitive fine-finger manipulation."

(R. at 586.)

erred in rejecting the opinions of Plaintiff's treating physicians concerning Plaintiff's functional limitations stemming from her bilateral carpal tunnel syndrome condition. Accordingly, the Court will focus its discussion of the issues as they relate to Plaintiff's depression and bilateral carpal tunnel syndrome.

## IV. <u>DISCUSSION</u>

### A.   *The ALJ Properly Determined That Plaintiff's Depression Was Not A Severe Impairment*

At step two in the sequential analysis, the ALJ found that Plaintiff had severe impairments of bilateral carpal tunnel syndrome and vertigo but he did not expressly state that Plaintiff's depression was a severe impairment. (R. at 28.)  Substantial evidence supports the conclusion that Plaintiff's depression was not a severe impairment at step two or at any further step in the sequential evaluation. As such, even if Plaintiff's depression was sufficient to pass step two analysis the result would be no different because there was no evidence that Plaintiff's depression limited the mental activities generally required by unskilled sedentary work.[31] Accordingly, the Court finds that, while it would have been better had the ALJ made an explicit finding, the ALJ's analysis of Plaintiff's depression is, nonetheless, supported by substantial evidence and is not contrary to law.[32]

---

[31] *See, e.g.*, <u>Miller v. Barnhart</u>, 182 Fed. Appx. 959, 964 (11th Cir. 2006) (holding that even where ALJ improperly applied the regulations in reaching his decision, it did not constitute reversible error because the correct application would not contradict the ALJ's ultimate findings).

[32] *See* <u>Nigro v. Astrue</u>, No. 8:06-cv-2134-T-MAP, 2008 WL 360654, at *2 (M.D. Fla. Feb. 8, 2008). (Even if it might have been a better practice for the ALJ to make more explicit findings regarding the severity or non-severity of the Plaintiff's other impairments, the ALJ thoroughly discussed the evidence relating to all of the Plaintiff's impairments and took the combination of the Plaintiff's

(continued...)

An impairment is non-severe only if it is a slight abnormality having such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work despite the individual's age, education and work experience.[33] Conversely, an impairment is severe if it significantly limits one's physical or mental ability to do basic work activities.[34] For a medical condition to be considered "severe," it must constitute more than a "deviation from purely medical standards of bodily perfection or normality."[35] Thus, a diagnosis of "depression" does not necessarily compel the conclusion that the condition is disabling.[36] Although the threshold for meeting the definition of a "severe impairment" at step two is low, the burden is on the Plaintiff to provide evidence demonstrating the disabling impact of her depression.[37]

Contrary to Plaintiff's assertion that the ALJ "ignored" and "totally disregarded" treating and consultative source evidence that Plaintiff suffers from depression,[38] the ALJ did in fact address Plaintiff's depression in his evaluation of the evidence. (R. at 26-27.) Specifically, the ALJ summarized a report from consultative examiner, Dr. Michael

---

[32](...continued)
impairments into account in determining her residual functional capacity.)

[33] Davis v. Barnhart, 186 Fed. Appx. 965, 967 (11th Cir. 2006); Bridges v. Bowen, 815 F.2d 622, 625 (11th Cir. 1987).

[34] 20 C.F.R. § 404.1520(c).

[35] McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

[36] 20 C.F.R. §§ 404.1520(c), 416.920(c); see also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("[t]here must be a showing of related functional loss" for a psychological disorder to be considered disabling).

[37] Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[38] (Doc. 12.)

Bernstein, and relevant portions of medical records from Plaintiff's general health practitioner, Dr. Emmanuel Decade. *Id.*

Further, while the ALJ did not explicitly address  Dr. C. Anderson's assessment[39] in his written decision, the ALJ's decision was made "after careful consideration of the entire record"[40]—upon which Dr. Anderson's assessment was based. (R. at 380-97.) An ALJ is not required to summarize the entire record before him in his written decision where the unmentioned medical evidence supports the ALJ's conclusion.[41]

One of the reasons noted by the ALJ which demonstrates that Plaintiff's depression was not a "severe" impairment was Plaintiff's failure to seek mental health treatment.[42] Noticeably absent from the record are any treatment notes from a treating mental health professional. The only evidence in the record suggesting Plaintiff sought any sort of mental health treatment is found in medical records from Dr. Decade, Plaintiff's general health practitioner. (R. at 466, 468-69.) Dr. Decade is not a mental health specialist.[43] Other than records from Dr. Decade, the only other evidence

---

[39] (R. at 380-97.) Dr. Anderson is a non-examining state agency physician who prepared a mental residual functional capacity assessment. (R. at 382.)

[40] (R. at 32.) Dr. Anderson's report appears in the record. (R. at 380-97.)

[41] *See* Cunningham v. Shalala, 880 F. Supp. 537, 551 (N.D. Ill.1995) ("[I]t is not incumbent upon the [ALJ] to specifically comment upon every bit of evidence in the record."). *Cf.* Nyberg v. Comm'r of Soc. Sec., No. 05-16286, 2006 WL 1168815, at *3 (11th Cir. May 2, 2006) (ALJ erred in failing to mention a physician's opinion in his written decision where the opinion contradicted the ALJ's findings; Krueger v. Astrue, No. 2:06-cv-465-FtM-29SPC, 2008 WL 596780, at *11(M.D. Fla. Feb. 29, 2008) (ALJ's failure to address contradictory treating physician's opinion was reversible error).

[42] *See* 20 C.F.R. § 404.1529(c)(3)(v); Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005).

[43] The appropriate weight to be given a treating physician's opinion is a function of many factual considerations. *See* 20 C.F.R. § 404.1527(d)(2). Furthermore, the Commissioner "generally give[s] more
(continued...)

10

concerning Plaintiff's mental health comes in the form of reports generated as a result of consultative examinations ordered by the Social Security Administration. (R. at 378-97.)

Moreover, while the medical records provided by Dr. Decade include several documents from the Joseph P. Addabbo Mental Health Clinic (R. at 499-500) the documents are not helpful and only include a letter instructing Plaintiff to have a physical examination performed by her physician prior to making her first appointment, and a Physical Exam Form completed by Dr. Decade on February 27, 2003. Because the record before the Court does not include any treatment notes from the Joseph P. Addabbo Mental Health Clinic, there is no evidence that Plaintiff ever actually underwent any mental health treatment at that facility.

In addition to the fact that there is no evidence of mental health treatment, the ALJ noted that Dr. Decade's office notes disclose that he prescribed medications to treat Plaintiff's subjective complaints of depression which, according to Dr. Decade, had stabilized Plaintiff and brought her anxiety and depression under "fair control." (R. at 451, 464, 466, 468-69.) The fact that an impairment can be adequately controlled by medication makes it less likely that the impairment is a "severe" impairment.[44]

Although, there was no evidence that Plaintiff's depression was sufficient to pass step two, even assuming that it was, it would not make any difference because there

---

[43](...continued)
weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." Id. § 404.1527(d)(5).

[44] See e.g., Brown v. Astrue, No. 07-14389, 2008 WL 2312398, at *4 (11th Cir. June 3, 2008) (ALJ did not err in accepting treating physician's opinion that plaintiff's condition had been stabilized by medication and concluding depression "non-severe").

was no evidence to support a finding at step four of the sequential analysis that Plaintiff had a severe mental impairment which limited her ability to carry out mental activities at her given RFC level. At step four of the sequential analysis, the relevant considerations include whether Plaintiff has "a limited ability to carry out certain mental activities, such as limitations in understanding, remembering, . . . carrying out instructions, and . . . responding appropriately to supervision, co-workers, and work pressures in a work setting."[45]

In order to meet the qualifications for unskilled sedentary work - the RFC the ALJ concluded could be performed by Plaintiff - an individual must: have basic communication skills; be able to understand, remember and carry out simple instructions; be able to engage in simple decision-making, and respond appropriately in usual work situations and adapt to a routine work setting.[46]

A review of the medical evidence discloses that while Plaintiff was diagnosed with moderate to severe dysthymia[47] by Dr. Bernstein (R. at 378-79) Dr. Bernstein did not identify any limitations attributable to Plaintiff's depression which would impact Plaintiff's ability to work.

Dr. Anderson, the non-examining state agency physician, noted that Plaintiff did not have any thought disorders and her dysthymia diagnosis did not meet or equal a

---

[45] Id. § 404.1545(c).

[46] Soc. Sec. Admin. Rul. 96-9p, 61 Fed. Reg. 34,478 (July 2, 1996).

[47] Dysthymia "is characterized by at least 2 years of depressed mood for more days than not, accompanied by additional depressive symptoms that do not meet criteria for a [m]ajor [d]epressive [e]pisode." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 345 (4th ed. 2000).

listed impairment. (R. at 382, 387, 395.) Dr. Anderson concluded that Plaintiff's memory and concentration were not significantly impaired and she "is able to understand, concentrate, remember, adapt, relate, and persist with tasks on a sustained basis." (R. at 382.) Dr. Anderson did find that Plaintiff's depression imposed moderate limitations on her ability to respond appropriately to changes in the work setting and her ability to set realistic goals or make plans independently of others. (R. at 381.) However, Dr. Anderson's report does not support a finding that, as a result of her depression, Plaintiff is substantially impaired in her ability to engage in any of the mental activities generally required by unskilled sedentary work.[48]

Therefore, because the RFC the ALJ found Plaintiff could perform took into account any minimal limitations which were caused by depression, the ALJ did not err in his assessment of Plaintiff's depression.

**B.    *The ALJ Committed Reversible Error By Rejecting A Treating Source Opinion Concerning Plaintiff's Manipulative Limitations*.**

Although the Court concludes that the ALJ did not commit reversible error in his assessment of Plaintiff's depression, he committed reversible error in rejecting the opinion of Dr. Krishna, a treating source, with regard to Plaintiff's manipulative limitations.

The record evidence shows that Plaintiff has a long history of bilateral carpal tunnel syndrome. The ALJ deemed this condition to constitute a severe impairment limiting Plaintiff's ability to work, but not meeting or equaling a listed impairment. (R. at

---

[48] *See* Soc. Sec. Admin. Rul. 96-9p, 61 Fed. Reg. 34,478 (July 2, 1996).

13

28.) Plaintiff argues that the ALJ's assessment of Plaintiff's manipulative capabilities at step four[49] was not in accord with the medical opinions of Plaintiff's treating physicians, Dr. Decade and Dr. Ranga C. Krishna. According to Plaintiff, the ALJ erred in his application of the law of the Eleventh Circuit as it pertains to the appropriate weight to be given to treating source opinions because the ALJ placed undue reliance on the testimony of Dr. Martin Fechner, a non-examining physician, in rejecting the medical opinions of Dr. Decade and Dr. Krishna.

In the Eleventh Circuit, the law is clear that substantial or considerable weight must be given to the opinion, diagnosis, and medical evidence of a treating physician absent a showing of "good cause" to the contrary.[50] A treating physician's opinion on the nature and severity of a claimant's impairments is to be given controlling weight where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record.[51] Conclusory statements are entitled to only such weight as can be supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.[52]

---

[49] Here, Plaintiff's ability to use her hands for fine and gross manipulation is relevant to whether she has non-exertional limitations that must be considered by the ALJ during steps four and five of the ALJ's analysis. *See* Soc. Sec. Admin. Rul. 96-9p, 61 Fed. Reg. 34,478 (July 2, 1996).

[50] Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1159 (11th Cir. 2004); O'Neal v. Astrue, 5:07-cv-143-Oc-10GRJ, 2008 WL 2439885, at *3 (M.D. Fla. June 13, 2008); *see also* 20 C.F.R. § 404.1527(d) (describing the manner in which the ALJ is to evaluate medical evidence).

[51] 20 C.F.R. § 404.1527(d)(2).

[52] Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986); *see also* Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987).

When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the medical evidence supporting the opinion; (4) consistency with the record a whole; (5) specialization in the medical issues at issue; and (6) other factors which tend to support or contradict the opinion.[53] "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate his reasons."[54]

Plaintiff argues that the ALJ relied too heavily on the opinion of Dr. Fechner, the non-examining medical expert who testified at the hearing. (R. at 564-83.) Absent good cause, it is error for the ALJ to defer to the assessment of a non-examining physician, especially when it is inconsistent with the opinions of Plaintiff's consultative and treating physicians.

Based on Dr. Fechner's review of some of Plaintiff's medical records,[55] Dr. Fechner opined that Plaintiff is capable of lifting up to ten pounds and is capable of performing gross manipulations "very nicely" and repetitive fine manipulation occasionally. (R. at 566-67.) Dr. Fechner's opinion directly conflicts with the opinion of Plaintiff's treating neurologist, Dr. Krishna.

---

[53] 20 C.F.R. § 404.1527(d).

[54] Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).

[55] The records provided to Dr. Fechner prior to the hearing did not include Dr. Krishna's report dated October 20, 2005. (R. at 492.) Dr. Fechner testified that the most recent medical report concerning Plaintiff provided to him prior to the hearing was dated June 2003. (R. at 565.)

According to Dr. Krishna, the effect of bilateral carpal tunnel syndrome on Plaintiff precludes her from lifting or carrying more than five pounds occasionally. (R. at 495.) Dr. Krishna also found Plaintiff to be "significantly limited but not completely precluded" from using her hands to perform both gross and fine manipulations. (R. at 497.)

The ALJ failed to articulate reasons sufficient to demonstrate good cause to accept Dr. Fechner's contradictory assessment over that of Dr. Krishna, Plaintiff's treating neurologist. Contrary to the ALJ's assertion that Dr. Krishna's opinion is "non-specific" and "unsupported by objective medical findings,"[56] Dr. Krishna's opinion was based upon both specific clinical findings and supportive objective test results. (R. 493-94, 496-97.) Specifically, Dr. Krishna noted that Plaintiff demonstrated tenderness, redness, swelling, loss of sensation, loss of fine coordination and a decreased range of motion in both hands. (R. at 493.) Plaintiff's symptoms included constant pain in both hands with radiation to her fingers with numbness (R. at 494-95). Dr. Krishna opined that Plaintiff's symptomatology and pain would increase with the performance of significant repetitive carrying, lifting, reaching, handling, or fingering. (R. at 495-96.) Dr. Krishna stated that his observations and findings were consistent with his diagnosis of Plaintiff and substantiated his opinion by citing to supportive objective test results.[57]

---

[56] (R. at 30.)

[57] (R. at 494.) Specifically, Dr. Krishna stated that Plaintiff's electromyography (EMG) and nerve conduction velocity (NCV) results supported his assessment. EMG and NCV studies are diagnostic techniques readily used in the medical field in the assessment and diagnosis of symptoms consistent with carpal tunnel syndrome. *See* NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE, *Carpal Tunnel Syndrome Fact Sheet* (Nat'l Inst. Health, Pub. No. 03-4898, 2002).

16

Dr. Fechner, on the other hand, solely based his opinion upon Plaintiff's testimony and the incomplete set of medical records provided to him prior to the hearing. (R. at 564-65.) Specifically, he testified that he was basing his opinion on his evaluation of the totality of the records provided to him and conceded that "there may have been an EMG done since June of [2003] which [he didn't] know about." (R. at 565.) In addition, Dr. Krishna's report was accepted into the record *after* the date of the hearing. (R. at 492, 548-49.) Thus, in addition to being a non-treating and non-examining physician, Dr. Fechner's testimony and corresponding assessment of Plaintiff was made without the benefit of Dr. Krishna's report. This is especially significant because Dr. Fechner explicitly stated that he discounted an opinion similar to Dr. Krishna's rendered by Dr. Decade, another treating physician, due to the fact that Dr. Decade is "certainly not a neurologist." (R. at 572.)

The ALJ's rationale for accepting Dr. Fechner's assessment over that of Dr. Krishna's is also flawed because Dr. Krishna's findings are not "contrary to the majority of the objective evidence." (R. at 30.) In fact, not only is Dr. Krishna's opinion consistent with the medical record as a whole, but most of the medical evidence the ALJ expressly relied upon supports, rather than contradicts, Dr. Krishna's findings.

According to the ALJ, "[t]he record is devoid of clinical or radiological evidence of decreased grip strength [and] muscle atrophy." (R. at 29.) However, the ALJ's statement is not only contradictory to the ALJ's own summary of the evidence,[58] but it is also inconsistent with the evidence cited by the ALJ in support of his decision. For example,

---

[58] (R. at 26-27.)

both Dr. Debra Milek[59] and Dr. Robert D. Goldstein[60] found evidence of thenar muscle weakness. (R. at 431). Dr. Milek also documented Plaintiff's history of both decreased grip and muscle atrophy. (R. at 219, 227, 230-31.)

The ALJ also relied upon the reports of Dr. Goldstein and Dr. Nesoff, two consultative medical examiners, as support of his decision to reject the medical opinion of Dr. Krishna.  Yet, when their reports are viewed in their entirety, both Dr. Goldstein and Dr. Nesoff documented clinical findings consistent with carpal tunnel syndrome of the severity Dr. Krishna described. For example, while Dr. Nesoff notes that Plaintiff has normal grip strength and range of motion in her wrists, he also documents positive clinical findings which are consistent with Dr. Krishna's opinion that Plaintiff experiences pain, numbness, and tingling in her hands due to carpal tunnel syndrome.[61] Dr. Nesoff also reports Plaintiff's normal wrist x-ray results. This objective finding is of little relevance because x-rays are not among the diagnostic tools typically used to evaluate carpal tunnel syndrome.[62]

---

[59] Dr. Milek was one of Plaintiff's treating physicians in New York for four years. (R. at 213-38.)

[60] At the request of the New York Worker's Compensation Board, Dr. Goldstein conducted two independent medical examinations of Plaintiff. (R. at 427-33.)

[61] Dr. Nesoff reported positive Phalen's results bilaterally and positive Tinel's results in Plaintiff's right extremity. (R. at 399.) The Phalen's maneuver and the Tinel's test are both commonly used to detect carpal tunnel syndrome. *See* NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE, *Carpal Tunnel Syndrome Fact Sheet* (Nat'l Inst. Health, Pub. No. 03-4898, 2002); DORLAND'S MEDICAL DICTIONARY, *Phalen Maneuver* and *Tinel Sign* (2007).

[62] *See* NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE, *Carpal Tunnel Syndrome Fact Sheet* (Nat'l Inst. Health, Pub. No. 03-4898, 2002).

Dr. Goldstein's physical examination of Plaintiff on June 23, 2003,[63] revealed no swelling or radicular signs. The ALJ specifically noted that Dr. Goldstein was unable to reconcile Plaintiff's subjective complaints with the reportedly normal results from Plaintiff's April 2002 EMG. (R. at 431.) In his analysis, the ALJ does not, however, mention the portion of Dr. Goldstein's report noting clinical findings consistent with mild to moderate impairment of the range of motion in Plaintiff's wrists,[64] mild bilateral thenar muscle weakness,[65] and a weakly positive Tinel's sign bilaterally. (R. at 427-33.) Nor does the ALJ acknowledge that Dr. Goldstein's conclusion was based on his review of the *limited* records provided to him presumably by the agency initiating the exam in addition to his examination.[66] While many of the records Dr. Goldstein refers to in his report are not in the record, it appears that Dr. Goldstein was not provided with the results of the electrodiagnostic test performed on April 22, 2002, which revealed that Plaintiff has a "very severe hypoesthetic condition" bilaterally.[67] (R. at 376, 431.) In addition, Dr. Goldstein's prior assessment of Plaintiff in November 2002 revealed abnormal EMG results. (R. at 429.) Thus, Dr. Goldstein's inability to reconcile his clinical

---

[63] Dr. Goldstein reports that he previously conducted an independent medical examination of Plaintiff on November 18, 2002. (R. at 429.)

[64] *See* MEDICAL GUIDELINES OF THE NEW YORK STATE WORKERS' COMPENSATION BOARD 11-13 (1996).

[65] Thenar muscles are instrumental in the coordination and use of the thumb and finger—especially for pinching. KATHRYN G. PARKER & HAROLD R. IMBUS, CUMULATIVE TRAUMA DISORDERS: CURRENT ISSUES AND ERGONOMIC SOLUTIONS 116 (1992). Thenar muscle atrophy appears in more severe cases of carpal tunnel syndrome. Anthony J. Viera, *Management of Carpal Tunnel Syndrome*, AM. FAM. PHYSICIAN (July 15, 2003).

[66] Dr. Goldstein conducted the exam at the request of the New York Workers' Compensation Board. (R. at 433.)

[67] (R. at 376, 431.) Hypoesthesia is defined as "abnormally decreased sensitivity to stimuli." DORLAND'S MEDICAL DICTIONARY, *Hypoesthesia* (2007).

findings with Plaintiff's "reportedly normal" electrodiagnostic testing is inconsistent with both the record and Dr. Goldstein's own assessment of Plaintiff.[68] Therefore, to the extent the ALJ relied on the reports of the consultative examining physicians in discrediting Dr. Krishna's opinion, the ALJ erred.

The ALJ also relied upon Dr. Milek in rejecting the opinion of Dr. Krishna. For example, the ALJ referred to Dr. Milek's office note of January 2, 2002, commenting that Plaintiff was "doing well" and Plaintiff's condition was "stable." (R. at 29.) In light of the fact that Dr. Milek and her associates treated Plaintiff over the course of four years (including the period immediately following Plaintiff's carpal tunnel release surgery), reliance upon one isolated comment by Dr. Milek is misleading and ignores the entirety of her medical records. In addition, the ALJ's reliance upon Dr. Milek's comment that Plaintiff's condition was "stable" is misplaced because the ALJ failed to mention that Dr. Milek attributed this to Plaintiff's absence from the exacerbating conditions of her work environment.

Lastly, the ALJ's rejection of Dr. Krishna's findings because they were inconsistent with Dr. Krishna's own assessment of Plaintiff mischaracterizes the evidence. For example, the ALJ pointed out  that Dr. Krishna "noted that [Plaintiff] did not have reduced grip strength in her bilateral hands." (R. at 29.) This comment is misleading because Dr. Krishna did not "note" Plaintiff's decreased grip strength—but rather simply did not place a check mark next to "reduced grip strength" on the Bilateral

---

[68] Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997) ("'[G]ood cause' . . . exist[s] where the doctor's opinion [is] not bolstered by the evidence, or where the evidence support[s] a contrary finding" and also where "the doctors' opinions [are] conclusory or inconsistent with their own medical records").

Manual Dexterity form he completed on behalf of Plaintiff. Whether this omission was intentional is unclear because Dr. Krishna *did* place a check mark next to the "right hand" and "left hand" designations on the same line. (R. at 493.) Even assuming the omission was intentional, Dr. Krishna's overall conclusion that Plaintiff was significantly limited in her ability to use her hands for fine and gross manipulations does not hinge upon whether Plaintiff had reduced grip strength. Plaintiff's grip strength is one of many factors Dr. Krishna assessed in reaching his opinion.

As the ALJ's RFC evaluation of Plaintiff essentially mirrors Dr. Fechner's opinion concerning Plaintiff's functional limitations,[69] it is apparent that the ALJ formulated Plaintiff's RFC relying heavily on the residual functional assessment rendered by the non-examining agency physician, Dr. Fechner, rather than giving appropriate weight to the medical opinion of Dr. Krishna.[70]

In sum, the Court concludes that while the ALJ discussed reasons for rejecting the opinion of Dr. Krishna the reasons were not based upon substantial evidence of record. Because "[b]ilateral manual dexterity is necessary for the performance of substantially all unskilled sedentary occupations"[71] the ALJ's error in rejecting the opinion of Dr. Krishna directly impacted the RFC evaluation. Accordingly, the ALJ's failure to give controlling weight to Dr. Krishna's assessment of Plaintiff's limitations

---

[69] The ALJ found plaintiff capable of lifting up to 10 pounds frequently and able to perform fine manipulation occasionally. (R. at 30.) After considering both her exertional and non-exertional limitations, the ALJ also concluded that "[b]ased on [Plaintiff's] residual functional capacity, she is capable of performing a significant range of sedentary work as defined in 20 C.F.R. § 404.1567." (R. at 31.)

[70] Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987) ("The opinions of nonexamining, reviewing physicians . . . when contrary to those of the examining physicians are entitled to little weight, and standing alone do not constitute substantial evidence.").

[71] Soc. Sec. Admin. Rul. 96-9p, 61 Fed. Reg. 34,478 (July 2, 1996).

concerning her ability to use her hands for fine manipulation warrants reversal of this matter to the Commissioner for further proceedings.[72]

## V.  CONCLUSION

In view of the foregoing, it is hereby **ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner, for an Administrative Law Judge to properly assess and evaluate Plaintiff's residual functional capacity with respect to her gross and fine manipulation capabilities giving appropriate weight to the opinion of Dr. Krishna and to conduct such further proceedings as the Commissioner deems appropriate. The Clerk is directed to enter final judgment in favor of the Plaintiff consistent with this Order and to close the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on August 20, 2008.

Copies to:

     All Counsel

GARY R. JONES
United States Magistrate Judge

---

[72] Because the Court is remanding this matter for further proceedings, the Court will comment briefly with regard to Plaintiff's argument that the ALJ erred in failing to give controlling weight to the opinion of Dr. DeCade.  For the following reasons the Court concludes that the ALJ did not err and that the ALJ clearly articulated reasons for not giving controlling weight to Dr. Decade's opinion. First, Dr. Decade's office notes documented Plaintiff's subjective complaints and symptoms but he did not include any reference to relevant clinical findings or diagnostic test results. Furthermore, the ALJ correctly noted that Dr. Decade's opinion conflicted with his own medical records. Lastly, unlike Dr. Krishna, Dr. Decade is not a specialist.